COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-321-CV
 
 
ALLSTATE TEXAS LLOYDS                                                    APPELLANT
 
V.
  
C. ROBERT MASON AND DEBORAH 
MASON                               APPELLEE
 
------------
 
FROM THE 211TH 
DISTRICT COURT OF DENTON COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        This 
suit involves a dispute over whether foundation damage to appellees C. Robert 
Mason and Deborah Mason’s house is covered under appellant Allstate Texas 
Lloyds’s homeowners insurance policy. The policy excludes coverage for loss 
caused by “settling, cracking, bulging, shrinkage, or expansion of 
foundations, walls, floors, ceilings.” Excepted from this exclusion is loss 
caused by “Accidental Discharge, Leakage or Overflow of Water or Steam from 
within a plumbing, heating or air conditioning system or household appliance.” 
At issue is whether foundation and other related damages to the Masons’ house 
were caused by a plumbing leak. Allstate denied coverage, and the Masons sued 
for breach of contract, the breach of the duty of good faith and fair dealing, 
unconscionable conduct, and unfair or deceptive acts or practices under the 
Texas Deceptive Trade Practices Act and the Texas Insurance Code. Following a 
jury trial, the trial court rendered judgment on the jury verdict, awarding the 
Masons $163,159.76 in actual damages, $88,561.97 in statutory damages, $74,600 
in attorney’s fees, $49,216.02 costs in pre- and post-judgment interest and 
costs, and $3.5 million in exemplary damages.
        In 
six issues on appeal, Allstate challenges the award of exemplary damages, the 
admission of the Masons’ expert testimony into evidence, the admission of 
testimony into evidence regarding Allstate’s opposition to a pretrial 
appraisal of the damages to the house, and the legal and factual sufficiency of 
the evidence to support the judgment. We affirm in part and reverse and render 
in part.
II. Factual Background
        The 
Masons’ house is located at 1108 Dentonshire in Carrollton, Texas. It was 
built in the late 1980s along with two neighboring houses by the same builder. 
Shortly after the three houses were built, each house suffered foundation 
settlement with their low points at the southeast corners and their high points 
at the northwest corners. The owners of the other two houses sued the builder 
because the foundation damages were so severe. The owners of the house at 1108 
Dentonshire did not join the suit.
        The 
house at 1108 Dentonshire was built on a sloping embankment with the back of the 
house cut into the hill and the rest of the house founded on “fill.” 
Apparently the builder did not compact the soil, and the foundation settled and 
took the shape of the terrain’s slope before construction began. As a result, 
the house’s southeast corner rested about five to seven inches below other 
parts of the house. The settlement caused cracks in the house’s exterior and 
interior walls, including a large crack in the west exterior wall.
        Before 
placing the house on the market, the owners’ realtor retained Greg Wilson, an 
engineer, to inspect the house in January 1992. On the exterior of the house, 
Wilson saw tension breaks in the west wall brick, a vertical crack in the west 
wall mortar, a crack in the mortar over the front window, a separation at the 
roof gable, a separation between the brick and the west garage door frame, and 
heaving of the back patio and pool decking. Inside the house, Wilson saw heaving 
of the east patio door threshold, a tension crack over the east living room 
window, sheetrock damage in the living room ceiling, misalignment of the front 
entrance door and a patio door, separation at the northwest corner in the dining 
room, tension cracks over the master bedroom windows, sheetrock damage to the 
breakfast room ceiling, and a separation between the wall and ceiling over the 
stairs. Wilson concluded that subsurface water beneath the foundation caused the 
foundation upheaval and particularly the upheaval in the house’s north 
section.[1]
        Following 
his inspection, Wilson recommended that a French drain be installed to address 
the problem of underground water damaging the foundation. After the French drain 
was installed, Wilson visited the house again in September 1992 and saw that the 
drain appeared to be working, the foundation appeared stable, and the interior 
cracks had been repaired. The exterior damages, including the crack in the west 
wall, however, had not been repaired. No repairs were made to the foundation 
either.
        In 
1992, the Masons purchased the house and insured it with Allstate. Although 
Robert Mason knew that the seller made some repairs to the home, such as 
cosmetic repairs of hairline fractures and the installation of a French drain, 
Mason claimed that the house was in “excellent condition” when they 
purchased it. According to the Masons, the house remained in “pretty much 
perfect condition” until 1998 when cracks in the walls and ceilings began to 
appear.
        In 
1998, misalignment of doors and cracks in the bricks and sheetrock began to 
appear, caused by heaving in the foundation. The damages appeared to be similar 
to those sustained by the house after it was first built. For instance, new 
cracks reopened in the entry hall and the den ceiling in the same places where 
cracks had been previously repaired. There were large cracks in the pool deck 
and a large separation in the patio, as well as a crack in the exterior west 
wall. The house also continued to noticeably slope from its northwest corner to 
its southeast corner.
        The 
Masons hired Hargrave Construction Company to repair the damage to their house, 
which hired Vannier Engineering Company to inspect the house and make 
recommendations for repairing the foundation. In August 1998, Vannier inspected 
the house, and Hargrave recommended that a plumber check for plumbing leaks. The 
Masons then made a claim under their Allstate policy after receiving a 
foundation repair estimate from Hargrave.
        On 
December 29, 1998, Allstate assigned the claim to Glenn West, an adjuster who 
specializes in foundation claims. West contacted the Masons and sent a 
reservation of rights letter to them on January 12, 1999. The letter explained 
that the policy covered the cost of assessing the plumbing leak and any physical 
loss caused by it and did not cover the cost of repairing the plumbing leak and 
any damage caused by settling or expansion of the foundation or earth movement.
        During 
the investigation, the Masons used Allstate’s plumbing company, MCR Services, 
to check for plumbing leaks and make any necessary repairs. MCR located and 
repaired the plumbing leaks, including a leak underneath the west hall bathroom. 
Allstate paid MCR for the cost of accessing the plumbing leaks but not for the 
cost of fixing the broken pipes.
        Allstate 
also retained Owen Tolson, an engineer, to inspect the house and determine 
whether the damage to the house was caused by a leak. Tolson inspected the house 
on January 12 and 27, 1999. During these inspections, Tolson learned about the 
history of the house, examined the failed pipe and plumbing diagnostics, and 
obtained soil data. During his investigation, Tolson also reviewed Wilson’s 
1992 report discussing the house’s subsurface drainage and foundation 
problems.
        Based 
on his investigation, Tolson concluded that subsurface drainage caused the clay 
soil under the house to swell, leading to the foundation upheaval, and that the 
subsurface drainage combined with the soil expansion was alone sufficient to 
damage the house. The swelling of the clay soil and resulting foundation 
movement in turn damaged the house and broke the pipe in two. Tolson based his 
conclusion on the fracture of the pipe and the fact that the grade elevation for 
the west hall bathroom was lower and many feet away from the foundation’s high 
point. Tolson concluded that the plumbing leak in the west hall bathroom did not 
cause the damage to the house.[2]
        West 
reviewed Tolson’s report and the plumbing information and determined that 
Allstate did not owe on the claim. On February 25, 1999, West wrote to the 
Masons to inform them that Allstate was denying their claim based on the lack of 
evidence that plumbing caused the damage.
        The 
Masons filed suit against Allstate for breach of contract and the duty of good 
faith and fair dealing. The Masons requested a court order compelling Allstate 
to participate in an appraisal of damages to the house, even though no liability 
had yet been established. Over Allstate’s objection, the trial court ordered 
an appraisal. The appraisers found that the repair costs to the house amounted 
to $142,159.76 and that $21,000 in living expenses would also be needed.
        After 
hearing the evidence, the jury found that Allstate breached the insurance policy 
and its duty of good faith and fair dealing; the jury found that it breached the 
latter with malice. The jury also found that Allstate knowingly engaged in 
unconscionable conduct and knowingly committed an unfair or deceptive act or 
practice, violating the Texas Insurance Code and Texas Deceptive Trade Practices 
Act (DTPA). The jury awarded the Masons $142,159.76 in repair costs and $21,000 
in living expenses for the breach of contract claim. The jury also awarded the 
same amounts for the breach of the duty of good faith and fair dealing and the 
violations of the insurance code and DTPA. Finally, the jury awarded $3.5 
million in exemplary damages.
        The 
Masons moved for judgment on the verdict, and Allstate moved for judgment 
notwithstanding the verdict. The trial court entered a final judgment in favor 
of the Masons, awarding them $163,159.76 in actual damages for breach of 
contract, $88,561.97 for the violation of article 21.55 of the insurance code, 
and $3.5 million in exemplary damages. The trial court also found that the 
Masons were entitled to recover on the jury’s findings of unconscionable 
conduct and breach of the duty of good faith and fair dealing, “whichever 
remedy permits the greater recovery”; the judgment did not specify, however, 
how much the Masons were entitled to recover for those claims. The Masons 
elected to recover under “the DTPA ‘Unconscionable Action’ Cause of Action 
and the Good Faith and Fair Dealing Cause of Action and 21.55 of the Texas 
Insurance Code, in addition to the recovery under the Breach of Contract Cause 
of Action.” The trial court further found that should those findings be 
reversed on appeal, the Masons would be entitled to recover $489,479.28 for 
“knowing” violations of the DTPA and article 21.21 of the insurance code. 
Finally, the trial court awarded the Masons $74,600 in attorney’s fees, which 
Allstate does not challenge on appeal.
III. Expert Testimony
        In 
Allstate’s fifth issue, it argues the trial court erred in admitting into 
evidence Jim Linehan’s testimony. Linehan, the Masons’ engineering expert, 
opined that all the damages to the Masons’ house were the result of a plumbing 
leak under the west hall bathroom. Allstate contends that this expert testimony 
was unreliable because Linehan did not rule out other plausible causes of the 
damage to the house and exclude those causes with reasonable certainty. 
Specifically, Allstate focuses on Linehan’s failure to determine the cause of 
the plumbing leak under the house and to adequately address whether the 
house’s pre-existing foundation problems were the true cause of the damage.
        Whether 
the trial court properly admitted expert testimony is subject to an abuse of 
discretion standard of review. Helena Chem. Co. v. Wilkins, 47 S.W.3d 
486, 499 (Tex. 2001); E.I. du Pont de Nemours & Co. v. Robinson, 923 
S.W.2d 549, 558 (Tex. 1995). To determine whether a trial court abused its 
discretion, we must decide whether the trial court acted without reference to 
any guiding rules or principles; in other words, whether the act was arbitrary 
or unreasonable. See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 
682, 687 (Tex. 2002); Downer v. Aquamarine Operators, Inc., 701 S.W.2d 
238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986). Merely 
because a trial court may decide a matter within its discretion in a different 
manner than an appellate court would in a similar circumstance does not 
demonstrate that an abuse of discretion has occurred. Downer, 701 S.W.2d 
at 241-42.
        An 
abuse of discretion does not occur where the trial court bases its decisions on 
conflicting evidence. Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978); 
see also Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997). Furthermore, an 
abuse of discretion does not occur as long as some evidence of substantive and 
probative character exists to support the trial court’s decision. Butnaru 
v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002); Holley v. Holley, 
864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ 
denied).
        A 
two-part test governs whether expert testimony is admissible: (1) the expert 
must be qualified; and (2) the testimony must be relevant and based on a 
reliable foundation. Helena Chem. Co., 47 S.W.3d at 499. A trial court 
has the threshold responsibility of ensuring that an expert's testimony rests on 
a reliable foundation and is relevant to the issues of the case. See Gammill 
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 728 (Tex. 1998). In 
meeting that responsibility, a trial court is not to determine whether an 
expert's conclusions are correct, but only whether the analysis used to reach 
those conclusions is reliable. See id.
        To 
guide trial courts in assessing reliability, the supreme court has crafted two 
tests: the Robinson-factor analysis and the “analytical gap” test. Gammill, 
972 S.W.2d at 727 (analytical gap test); Robinson, 923 S.W.2d at 556. 
Further, the supreme court has determined that expert testimony is unreliable if 
it fails to rule out other plausible causes. Merrell Dow Pharm., Inc. v. 
Havner, 953 S.W.2d 706, 720 (Tex. 1997), cert. denied, 523 U.S. 1119 
(1998); Robinson, 923 S.W.2d at 559; accord Martinez v. City of San 
Antonio, 40 S.W.3d 587, 595 (Tex. App.—San Antonio 2001, pet. denied); Weiss 
v. Mech. Associated Servs., Inc. 989 S.W.2d 120, 126 (Tex. App.—San 
Antonio 1999, pet. denied). Accordingly, a trial court properly excludes expert 
testimony as unreliable if: (1) the foundational data underlying the opinion is 
unreliable; (2) the methodology used by the expert to interpret the underlying 
data is flawed; (3) notwithstanding the validity of the underlying data and 
methodology, there is an analytical gap in the expert evidence; or (4) the 
expert fails to rule out other plausible causes. See Kimberly S. Keller, Bridging 
the Analytical Gap: The Gammill Alternative to Overcoming Robinson & Havner 
Challenges to Expert Testimony, 33 St. 
Mary’s L.J. 277, 302-20 (2002).
        During 
the Daubert hearing, Allstate asked Linehan whether he knew what caused 
the pipes under the bathroom to break. Although he conceded that pipes could 
break due to soil movement (as well as other reasons), he stated that he did not 
investigate why the pipes broke in this case. When asked if soil movement strong 
enough to break pipes under the house would also be strong enough to damage the 
foundation, Linehan again replied that he did not investigate why the pipes 
under the bathroom broke.
        Based 
on this testimony, Allstate essentially seems to be arguing that Linehan’s 
failure to determine what caused the pipes to break rendered his opinion that 
leaks caused the damage to the house unreliable because he did not exclude with 
reasonable certainty the possibility that the foundation damage occurred first 
as a result of soil movement caused by subsurface drainage and that the soil 
movement then caused the PVC pipe to break. Several problems exist with this 
argument.
        First, 
Linehan had previously testified that he excluded the possibility that the 
problems that caused the foundation damage in 1992, which included soil movement 
resulting from subsurface drainage, were the cause of the damage in 1998.[3]  Linehan also testified that he did not believe that 
seasonal moisture, which could cause soil movement, caused the 1998 foundation 
damage.[4]  Incidentally, Allstate never 
specifically asked Linehan whether he excluded the possibility that subsurface 
drainage caused the soil under the house to move, which Allstate claimed at 
trial was the cause of the house’s 1998 foundation problems. But the evidence 
shows that he discounted the possibility.
        Moreover, 
Allstate’s questions to Linehan were based on hypothetical situations not 
shown to the trial court, in the record before us, to be actual plausible causes 
of the foundation damage that Linehan should have excluded in order for his 
opinion to be reliable. For example, there was no evidence presented during the 
hearing to show that soil movement was a plausible cause of the foundation 
problems or that the hypothetical soil movement was strong enough to break 
either PVC pipe or a concrete foundation. Moreover, because PVC pipe is not as 
strong as concrete, it is entirely possible that the foundation could have 
withstood a force that the pipe could not. Without evidence to support the 
implications of Allstate’s hypothetical, we cannot say that the trial court 
abused its discretion in not excluding the expert testimony because Allstate 
came up with a hypothetical theory at the hearing that even Allstate did not 
show was possible or provable until after trial began. Although Allstate’s 
attorney told the trial court that it had photographs and expert testimony to 
support its conclusion, it did not offer to admit the evidence at the hearing 
and that evidence was not introduced until after trial began.
        Based 
on the evidence presented at the Daubert hearing, we hold the trial court 
did not abuse its discretion in denying Allstate’s motion to strike 
Linehan’s testimony. We overrule Allstate’s fifth issue with regard to the 
trial court’s ruling on the admissibility of Linehan’s testimony.
IV. Legal and Factual Sufficiency of the Evidence
        In 
Allstate’s sixth issue, it challenges the legal and factual sufficiency of the 
evidence to support the jury’s findings of a breach of contract, breach of the 
duty of good faith and fair dealing, malice, unconscionable conduct, and knowing 
violations of the DTPA and insurance code. We will address each finding 
separately.
A. Standards of Review
        In 
determining a “no-evidence” or legal sufficiency issue, we are to consider 
only the evidence and inferences that tend to support the finding and disregard 
all evidence and inferences to the contrary. Bradford v. Vento, 48 S.W.3d 
749, 754 (Tex. 2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 
444, 450 (Tex. 1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 
661 (1951). Anything more than a scintilla of evidence is legally sufficient to 
support the finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 
935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the 
evidence furnishes some reasonable basis for differing conclusions by reasonable 
minds about the existence of a vital fact. Rocor Int’l, Inc. v. Nat’l 
Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).
        A 
“no-evidence” issue may only be sustained when the record discloses one of 
the following: (1) a complete absence of evidence of a vital fact; (2) the court 
is barred by rules of law or evidence from giving weight to the only evidence 
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is 
no more than a mere scintilla of evidence; or (4) the evidence establishes 
conclusively the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. 
Martinez, 977 S.W.2d 328, 334 (Tex. 1998) (citing Robert W. Calvert, "No 
Evidence" and "Insufficient Evidence" Points of Error, 
38 TEX. L. REV. 
361, 362-63 (1960)), cert. denied, 526 U.S. 1040 (1999).
        An 
assertion that the evidence is factually insufficient to support a fact finding 
means that the evidence supporting the finding is so weak or the evidence to the 
contrary is so overwhelming that the answer should be set aside and a new trial 
ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are 
required to consider all of the evidence in the case in making this 
determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998).
B. Breach of Contract
        Allstate 
contends that there is no evidence or insufficient evidence to show that the 
plumbing leak under the west hall bathroom caused the foundation damage to the 
house; thus, there is no evidence or insufficient evidence to show that Allstate 
breached the insurance policy by denying the Masons’ claim. Although we have 
concluded that the trial court did not abuse its discretion in admitting 
Linehan’s testimony into evidence, this does not necessarily mean that 
Linehan’s testimony at trial amounts to legally sufficient evidence that a 
plumbing leak caused the foundation damage to the house. In conducting a legal 
sufficiency review, we must also review the relevance and reliability of an 
expert’s testimony in light of all the evidence admitted at trial. See 
Havner, 953 S.W.2d at 713, 720; State Farm Lloyds v. Mireles, 63 
S.W.3d 491, 493 (Tex. App.—San Antonio 2001, no pet.) (“The question of the 
admissibility of expert testimony goes hand in hand with this court's analysis 
under a legal sufficiency challenge.”). There is no question that Linehan’s 
testimony was relevant to the issues at trial.
        At 
trial, Linehan testified that the plumbing leaks under the house at the west 
hall bathroom caused 100% of the damage to the house. He negated the possibility 
of other causes, including soil movement, being responsible for the foundation 
damage because, according to Linehan, the damage in 1998 occurred suddenly, 
which is not typical for foundation damage caused by soil movement, and there 
was no evidence of soil movement from 1992 through 1998.
        Linehan 
testified at trial:
Q. Okay. Have you--have you 
checked with Mr. Mason to determine if the French drain has continued to work?
 
A. Mr. Mason has told me that 
every time it rains, the water keeps pouring out the French drain wonderfully. 
He has noticed no time at which it has plugged up or anything else. So a lot of 
work was done in 1992 prior to Mr. Mason buying the house and when they went in 
the house and repaired the sheetrock cracks, fixed the house up.
 
Mr. Mason came to the 
house--and his wife bought the house. And he told me, he says, if the house was 
a mess in 1992, he wouldn't have bought the house. It was fine in 1992. Did it 
have prior problems? Yes, it did. Were they corrected? Yes, they were. And then 
Mason comes by and buys himself a nice house in 1992.
 
Q. What is the next thing that 
historically is important to you in--regarding this house?
 
A. Well, the next thing that 
was important to me was how about 1993, Mr. Mason? Was the house fine then? Yes, 
it was. How about 1994? Yes, it was. Well in 1995? Yes, it was. '96? Yes. '97? 
The house is fine. What about 1998? Oh, things started happening in 1998. But 
the important thing to me is to not only write down 1998 but to tell me that he 
had six years in there the house wasn't moving substantially to cause any 
damage.
 
And he tells me--and I have 
it--
 
Q. Let me interrupt. If the 
drainage or the trees or the settlement or anything was wrong with this house, 
what would it have been doing during those six years?
 
A. It would have--it would--it 
would have continued to show movement, and sheetrock cracking would have got 
progressively worse between '92 and '98.
 
Q. And that didn't happen?
 
A. That didn't happen.
 
Q. Okay. What happened in '98?
 
A. The house began to tear 
itself apart. And we have some good photographs of that.

                . 
. . .
 
Q. Okay. What does it tell you 
then when you have this extensive damage around the location of the leak?
 
A. Well, we had the foundation 
uplift at the leak. We knew we had expansive clay soils. We knew we had a 
plumbing leak right here (Indicating). We had major damage all around here that 
suddenly began to occur over a short period of time. And once the leaks got 
fixed, it hasn’t occurred again.
 
We also know at the rest of 
the house there is no damage. So why did the damage occur here and not over 
here? Because the leaks affected the foundation here, but they did not affect 
the foundation over here (Indicating).
 
Q. On this area of the house 
where it is heaved up, how close is the French drain to that area?
 
A. It is several feet away.
 
Q. So the French drain would 
have prevented any--any--any rainwater from causing this heave?
 
A. That’s right.
 
. . . .
 
Q. Assume that the pipe broke 
because of the movement of the soil. If the soil is moving enough to break that 
pipe, it is going to be moving enough to damage that foundation, isn’t it?
 
A. Not necessarily, because 
pipe is not as strong as what the concrete is. So it--it could have broke the 
pipe first, released water underneath the house and really got the soils swelled 
that then uplifted and broke the foundation, and that--that could have also 
hypothetically happened that way.

        Linehan 
also relied on Wilson’s 1992 report, which concluded that after the French 
drain was installed, the problem of subsurface drainage had been eliminated. 
While Linehan did not himself investigate whether the French drain was working 
properly in 1998, Mr. Mason informed him that it was working. Finally, Linehan 
testified that unlike the foundation damage to the house in 1992 that covered 
several parts of the house, the damage in 1998 was limited to areas near the 
leak and that after the leak was repaired, the foundation stabilized. Thus, 
according to Linehan, the 1998 damage was caused by the leak and not by the same 
factors that caused the damage in 1992.
        Although 
at trial Linehan again testified that he did not investigate why the pipes 
broke, he stated that while soil movement might be enough to break the pipes it 
would not necessarily be enough to damage the foundation. Because PVC pipe is 
not as strong as concrete, the pressure from soil movement might not have been 
strong enough to damage the foundation, but could have broken the pipe, which in 
turn could have increased the swelling in the soil causing it to uplift further 
and then damage the foundation. Thus, according to Linehan, it was possible that 
the pipe broke and caused a leak and only as a result of the leak did the soil 
swell enough to cause the uplift.
        Based 
on the above evidence, we conclude that Linehan’s testimony was reliable 
because it sufficiently dispelled other possible causes of the 1998 foundation 
damage. Accordingly, we also hold that Linehan’s testimony amounted to legally 
sufficient evidence for the jury to conclude that the pipe leak caused the 
foundation damage, which in turn supported the jury’s finding that Allstate 
breached the insurance policy by denying the Masons’ claim.
        With 
regard to the factual sufficiency of the evidence, the jury was faced with two 
competing theories supported by expert testimony as to what caused the 
foundation damage. Allstate’s theory was that soil movement caused the 
foundation damage, and the Masons’ theory was that the plumbing leak under the 
west hall bathroom did. As previously discussed, in support of the theory that 
the plumbing leak under the west hall bathroom caused the foundation damage, the 
jury heard Linehan’s testimony.
        To 
support the theory that soil movement caused the damage, Allstate introduced the 
testimony of three witnesses. First, Owen Tolson testified that in his 
professional opinion, subsurface water from seasonal moisture made its way under 
the house and caused the uplift in the foundation. Tolson based this opinion on 
the history of the house, an examination of the French drain, the elevations in 
the foundation, and an examination of the nature of the break of the pipes that 
were removed from under the house. Tolson testified that the pipe leaks did not 
cause the foundation damage and that the only explanation for the leak in the 
PVC pipe was that it snapped due to soil movement caused by subsurface drainage 
moving underneath the house. According to Tolson, the nature of the fracture in 
the pipe indicated that the pipe broke after the foundation.
        Gregory 
Wilson testified about his inspection of the damage to the house in 1992 and 
that his recommendation was to eliminate the drainage problem by installing a 
French drain. Wilson testified that he reinspected the house later in 1992 after 
the French drain had been installed to see if it was working properly. He noted 
that the damages to the interior had been repaired but that the exterior damages 
had not; the foundation, however, appeared stable. Further, Wilson testified 
that French drains need to be checked every five years for maintenance and to 
make sure they are not clogged. If they get clogged, they will not function 
properly. Finally, Wilson testified that while French drains will usually fix 
subsurface drainage problems, sometimes the drains do not solve the problem.
        Tim 
Slider, an Allstate engineering expert, testified that he inspected the home in 
2000. During his inspection, Slider noticed that the home sloped toward the 
street, there was distress around the house, the pool separated from the 
perimeter of the foundation, and there was a large crack in the exterior veneer. 
The sloping originally occurred because the house had been constructed on a 
fairly steep sloping embankment without being properly placed, resulting in the 
house settling and assuming the shape of the slope over time. As a result of the 
open joint between the pool deck paving and the house, Slider opined that water 
collected at the crack and was absorbed into the soil, which led to moisture 
collecting in the soil under the house and causing the house to heave. Slider 
also testified that although the plumbing leak was not the primary cause of 
damage to the house, it could have “potentially” contributed to some heaving 
in the house.
        With 
competing contentions supported by expert witnesses on both sides, the burden 
fell on the jury to determine which contention was more credible. Turner v. 
KTRK Television, Inc., 38 S.W.3d 103, 134 (Tex. 2000) (“Under established 
Texas jurisprudence, a reviewing court must defer to the fact-finder's 
credibility determinations because the jury is the exclusive judge of the facts, 
the witnesses' credibility, and the weight given to their testimony.”). We 
will not second-guess the fact-finder’s determination.
        Having 
reviewed all the evidence in support of both theories, we conclude that evidence 
supporting the finding that a plumbing leak caused the foundation damage is not 
so weak or the evidence to the contrary so overwhelming as to require that the 
jury’s verdict on the breach of contract claim be set aside. Thus, we hold 
there was factually sufficient evidence for the jury to conclude that Allstate 
breached the insurance policy. We overrule Allstate’s legal and factual 
sufficiency challenges to the jury’s finding of breach of contract.
C. Breach of the Duty of Good Faith and Fair Dealing
        The 
jury determined that Allstate failed to attempt in good faith to effectuate a 
prompt, fair, and equitable settlement of a claim when its liability had become 
reasonably clear and refused to pay a claim without conducting a reasonable 
investigation of the claim. Allstate contends that there is legally and 
factually insufficient evidence to support the jury’s finding.
        An 
insurer has a duty to deal fairly and in good faith with its insured in the 
processing and payment of claims. Republic Ins. Co. v. Stoker, 903 S.W.2d 
338, 340 (Tex. 1995); Arnold v. Nat’l County Mut. Fire Ins. Co., 725 
S.W.2d 165, 167 (Tex. 1987). A breach of the duty of good faith and fair dealing 
is established when: (1) there is an absence of a reasonable basis for denying 
or delaying payment of benefits under the policy and (2) the carrier knew or 
should have known that there was not a reasonable basis for denying the claim or 
delaying payment of the claim. Republic Ins. Co., 903 S.W.2d at 340. 
“The first element of this test requires an objective determination of whether 
a reasonable insurer under similar circumstances would have delayed or denied 
the claimant’s benefits.” Aranda v. Ins. Co. of N. Am., 748 S.W.2d 
210, 213 (Tex. 1988). This assures that a carrier “will not be subject to 
liability for an erroneous denial of a claim” as long as a reasonable basis 
for denial of the claim exists. Id.; see Lyons v. Millers Cas. Ins. 
Co. of Tex., 866 S.W.2d 597, 600 (Tex. 1993).
        Evidence 
that merely shows a bona fide dispute about the insurer's liability on the 
contract does not rise to the level of bad faith. Transp. Ins. Co. v. Moriel, 
879 S.W.2d 10, 17 (Tex. 1994); Nat’l Union Fire Ins. Co. v. Dominguez, 
873 S.W.2d 373, 376-77 (Tex. 1994). Nor is bad faith established if the evidence 
shows the insurer was merely incorrect about the factual basis for its denial of 
the claim or about the proper construction of the policy. Lyons v. Millers 
Cas. Ins. Co., 866 S.W.2d 597, 601 (Tex. 1993) (“[T]he issue of bad faith 
focuses not on whether the claim was valid, but on the reasonableness of the 
insurer's conduct in rejecting the claim.”). A simple disagreement among 
experts about whether the cause of the loss is one covered by the policy will 
not support a judgment for bad faith. Id. To the contrary, an insured 
claiming bad faith must prove that the insurer had no reasonable basis for 
denying or delaying payment of the claim and that it knew or should have known 
that fact. Transp. Ins. Co., 879 S.W.2d at 18.
        An 
insurer's reliance upon an expert's report, standing alone, will not necessarily 
shield the carrier if there is evidence that the report was not objectively 
prepared or the insurer's reliance on the report was unreasonable. State Farm 
Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997). Evidence casting doubt 
on the reliability of the insurer's expert's opinions may support a bad-faith 
finding. Id.
        Allstate 
claims that the evidence is legally insufficient to support the finding that it 
breached its duty of good faith and fair dealing because it reasonably relied on 
Tolson’s report that the plumbing leak did not cause the foundation damage in 
denying the claim. The Masons raise several factors that they claim call into 
question the reliability of Tolson’s report and the reasonableness of 
Allstate’s reliance on it and, as a result, shows sufficient evidence of bad 
faith.
        First, 
the Masons claim that because Wilson testified that the engineer, i.e., Tolson, 
was supposed to tell him what tests were needed and Tolson said he did not have 
authority to recommend testing, Tolson’s investigation of the damage to the 
house was somehow improper. We fail to see how this misunderstanding provides 
any proof that Allstate acted in bad faith.
        The 
Masons claim that Tolson was not present at the house when the plumbing repairs 
were done, implying that he could not exclude plumbing as the cause of the 
damage without being present. The record shows that after the plumbers removed 
the broken pipes from underneath the house, they laid them out on the ground and 
“talked [Tolson] through them . . . and [told him] the configuration of the 
pipe . . . matches up 100 percent with the configuration of the elevations.” 
There is no evidence that it was necessary for Tolson to be at the house when 
the plumbing repairs were conducted in order to exclude a plumbing leak as the 
cause of the foundation damage. Incidentally, Linehan was also not present 
during the repairs, yet he was able to determine that the plumbing leak caused 
the foundation damage.
        The 
Masons also claim that even though Tolson testified that “it was customary to 
take soil tests and to make flow tests in situations such as these,” Tolson 
did not conduct those tests. Tolson also testified that while the flow tests 
would have been helpful, they were not available and were not necessary and that 
only sometimes does he request soil tests. According to the Masons, the tests 
would have revealed how much the pipe was leaking and whether the soil under the 
west hall bathroom was saturated by rainwater, which would have confirmed 
Tolson’s theory, or fecal matter and chlorine, which would have shown that a 
plumbing leak had saturated the soil and caused the foundation damage. There was 
no dispute, however, that a plumbing leak existed under the west hall bathroom. 
Thus, the soil tests would have revealed sewage and chlorine regardless of the 
cause of the uplift. Further, Tolson testified that he did not need the soil 
tests because he already knew the soil under the house was expanding from 
moisture.
        The 
Masons also claim that Tolson ignored Wilson’s report that the French drain 
was working in making his determination that subsurface drainage caused the 
upheaval. There is no evidence that Tolson ignored Wilson’s report. As a 
matter of fact, Tolson testified that he examined Wilson’s report as part of 
his investigation. Although Wilson determined in 1992 that the French drain was 
working, Tolson concluded that subsurface drainage was still getting past the 
drain and under the house. There is no evidence that this conclusion was not 
made objectively.
        The 
Masons also claim that the jury heard evidence that Allstate’s “witnesses 
had avoided subpoenas, failed to bring documents to court, and that Allstate had 
failed to produce pipe for inspection that had been removed from the front 
yard.” The Masons have failed to cite to where in the record there is evidence 
that any witness avoided service. See Tex. R. App. P. 38.1(h). While the Masons’ trial 
attorney accused Tolson during cross-examination of avoiding service, there is 
no evidence that he in fact avoided service. There is also no evidence that 
Tolson intentionally failed to bring documents to court, and the Masons refer us 
to no evidence in the record showing that any other Allstate witness 
intentionally failed to bring documents to court. See id. Finally, the 
Masons provide no record reference for their contention that Allstate failed to 
produce the pipe that had been removed from the front yard. See id.
        The 
Masons also attempt to discredit Tolson based on the fact that he has worked for 
insurance companies in the past in conducting investigations. Although Tolson 
testified that he received a significant amount of his income from insurers, he 
testified that he also works for homeowners and that he does not believe that 
plumbing leaks can never cause foundation damage. As a matter of fact, before 
the trial in this case, Tolson had concluded that a plumbing leak had caused 
foundation damage while working for another insurance company. He also made a 
similar conclusion while working for Allstate on a different claim. The fact 
that Tolson wants to obtain more business from Allstate, by itself and in 
conjunction with the above, however, does not show that Tolson was necessarily 
biased against insureds.
        The 
evidence showed that Tolson conducted an adequate investigation of the house and 
surrounding property, that he took a history of the house, and that he examined 
reports regarding the house’s prior foundation problems. Although Tolson did 
not determine whether the French drain was working, that fact alone does not 
indicate that his conclusions were unreliable or that he did not arrive at them 
objectively. Tolson testified that in his opinion subsurface drainage could 
still be moving under the French drain. Based on the evidence available to 
Allstate at the time it denied the Masons’ claim, we hold that there is no 
evidence suggesting that Tolson’s investigation was unreliable and that 
Allstate acted unreasonably in its reliance on his investigation in denying the 
Masons’ claim. Accordingly, we conclude that there is no evidence that 
Allstate acted in bad faith when it denied the Masons’ claim. Thus, there is 
no evidence to support the jury’s verdict that Allstate breached its duty of 
good faith and fair dealing. We sustain Allstate’s legal sufficiency challenge 
to the jury’s finding of breach of the duty of good faith and fair dealing. 
Because we conclude that there is no evidence of bad faith, the jury’s finding 
of malice and punitive damages resulting from bad faith can no longer stand.
D. Unconscionable Conduct
        The 
jury also found that Allstate engaged in unconscionable conduct. 
“‘Unconscionable action or course of action’ means an act or practice 
which, to a consumer's detriment, takes advantage of the lack of knowledge, 
ability, experience, or capacity of the consumer to a grossly unfair degree.” Tex. Bus. & Com. Code Ann. § 17.45(5) (Vernon 2003). Allstate 
challenges the legal and factual sufficiency of the evidence to support the 
jury’s finding.
        As 
proof of unconscionable conduct, the Masons point to the letter Allstate sent to 
them that stated it would attempt to give the Masons “every advantage of your 
policy.” The Masons state that the evidence showed at trial that Allstate had 
no interest in seeing that they received the benefits due to them under the 
policy. Instead, the Masons claim that Allstate was interested in performing a 
sham investigation and denying their claim no matter what the consequences. We 
have already held that Allstate did not perform an unreasonable investigation 
and did not violate its duty of good faith and fair dealing. Allstate’s letter 
to the Masons does not show that Allstate attempted to take advantage of the 
Masons. Instead, the evidence shows that Allstate paid for the plumbing repairs 
as required under the insurance policy and investigated the claim that the 
plumbing leaks caused the damage to the home. After determining that the policy 
did not cover the damage, Allstate denied the claim based on Tolson’s report. 
The evidence does not show any unconscionable conduct on Allstate’s part. We 
sustain Allstate’s no evidence challenge to the jury’s finding of 
unconscionable conduct.
E. Knowing Violation of the DTPA and Insurance Code
        In 
response to charge question 3, the jury found that Allstate engaged in an 
“[u]nfair or deceptive act or practice” by making “misrepresentations 
relating to insurance” that included “[f]ailing to attempt in good faith to 
effectuate a prompt, fair, and equitable settlement of a claim when [its] 
liability has become reasonably clear” or “[r]efusing to pay a claim without 
conducting a reasonable investigation of the claim.” In response to charge 
question 5, the jury found Allstate committed such conduct knowingly. Although 
Allstate and the Masons address on appeal whether there is legally and factually 
sufficient evidence to find that Allstate committed an unfair or deceptive act 
or practice knowingly, we must first determine whether Allstate even 
committed such an act at all. Neither party concedes that it did.
        The 
question the jury was asked to decide with regard to whether Allstate committed 
an unfair or deceptive act or practice is the same as the one it was asked to 
decide with regard to whether Allstate breached its duty of good faith and fair 
dealing.[5]  Having already determined that 
Allstate did not breach its duty of good faith and fair dealing, we see no 
reason to readdress the same evidence here that we examined with regard to that 
issue. Based on the charge to the jury, a review of the same evidence would 
arrive at the same conclusion: There is no evidence to support the jury’s 
finding that Allstate “[failed] to attempt in good faith to effectuate a 
prompt, fair, and equitable settlement of a claim when [its] liability has 
become reasonably clear” or “[refused] to pay a claim without conducting a 
reasonable investigation of the claim.” Thus, we sustain Allstate’s 
challenge to the jury’s finding that it knowingly engaged in an unfair or 
deceptive act or practice.
        In 
light of our determination that there is no evidence that Allstate engaged in 
unconscionable conduct or committed an unfair or deceptive act or practice, the 
jury’s findings that Allstate acted knowingly in committing such acts and its 
award of actual and punitive damages for those causes of action can no longer 
stand. Furthermore, because we conclude that no evidence exists to support the 
jury’s findings that Allstate breached the duty of good faith and fair 
dealing, engaged in unconscionable conduct, or committed an unfair or deceptive 
act or practice, it is not necessary for us to address whether the trial court 
erred in admitting into evidence testimony showing that Allstate did not want to 
participate in the pretrial appraisal. See Tex. R. App. P. 47.1.
V. Conclusion
        Having 
held that legally and factually sufficient evidence exists to support the 
jury’s finding of breach of contract, and that no evidence exists to support 
the other complained of findings, we reverse the trial court’s award of 
exemplary damages and render judgment that the Masons take nothing on their 
claims for breach of the duty of good faith and fair dealing, unconscionable 
conduct, and unfair or deceptive act or practice. We affirm the trial court's 
judgment of $163,159.76 for breach of contract, $88,561.97 for statutory damages 
under article 21.55 of the Texas Insurance Code, $74,600 for attorney’s fees, 
and $49,216.02 for pre- and post-judgment interest.
  
  
                                                          SAM 
J. DAY
                                                          JUSTICE
 
  
PANEL A:   CAYCE, 
C.J.; HOLMAN, J.; and SAM J. DAY, J. (Retired, Sitting by Assignment).
DELIVERED: November 26, 2003


 
NOTES
1. Wilson also 
observed during his inspection that a neighboring house had window separations, 
brick cracks, and a barrier around it with a sign that said “danger, 
structure.” Other homes on the same street were having similar foundation 
problems.
2. Although 
there were several plumbing leaks, the Masons contend only that the leak in the 
west hall bathroom was responsible for the damage to the house.
3. Linehan 
testified:
Q. Now, in this case, did you 
do any work to see whether the foundation had deformed because of soil movement?
A. I read--I measured the 
foundation elevations and observed the structural distresses and the timing of 
such, combined with Mr. Mason, to form my opinion that there was soil movement 
caused by the plumbing leak that uplifted the foundation at that location at the 
bathroom.
. . . .
Q. So you will agree with me, 
won't you, that if you have got a foundation that has experienced upheaval to 
the point that it has deformed the foundation, that the foundation can be 
subject to seasonal moisture changes, correct?
A. No, I will not agree with 
that at all.
Q. Now, what did you do to 
rule out the possibility that any damage to this occurred--that occurred in 1998 
wasn't attributable to the same things that were happening back in January of 
'92?
A. There was no evidence that 
the failure that occurred in 1992 was present again in 1998, but in 1998, there 
was a plumbing leak at the hall bathroom. There was an uplift at the hall 
bathroom. There was substantial damage that occurred outside the house in 1998 
by Mr. Mason's testimony. And it also occurred inside the house in 1998, all 
confined to this area right in here (Indicating). All the prior problems had 
been at the rear of the garage, and there is no substantial movement at the 
rear--rear of the garage in 1998.
4. Linehan 
testified:
Q. And I had asked you this 
earlier about the foundation being damaged and needing to be repaired. Isn't it 
possible that when you have that occur, the foundation no longer resists 
movement so it may continue to move during its life during periods of wet or dry 
weather? Isn't that true?
A. If it has been fractured 
and damaged, it may continue to move due to seasonal moisture changes. That's 
right.
Q. And, for instance, if it is 
extremely dry, it could start to settle a little, go down lower?
                A. 
It could.
Q. Or during periods of heavy 
rain, go up?
A. That is correct. It could 
rock and roll or it could not move at all.
Q. Now in this case, with the 
upheaval that Mr. Wilson mentioned in his January '92 report, you didn't do any 
kind of investigation, did you, to see if the foundation had been damaged at 
that point in time to where it could no longer resist movement, did you?
A. There was no information 
available to me, sir.
Q. So you--the answer is you 
did nothing on that?
A. No. I did talk to Mr. 
Mason, and he hadn't had any signs of foundation movement between 1992 and 1998 
when it suddenly began to fall apart. If you are having foundation movement, you 
would have seen a series of cracking and breaking occurring between '92 and 
1998. The fact that for six years his house was spotless inside but with maybe 
one or two minor things and substantially suddenly it began to tear itself apart 
in 1998, there is very good evidence that it has not been moving due to seasonal 
moisture changes and was not broken in 1992.
5. In the 
charge, the jury was instructed that it should find Allstate breached its duty 
of good faith and fair dealing and committed an unfair or deceptive act or 
practice if evidence existed that Allstate either (1) failed to attempt in good 
faith to effectuate a prompt, fair, and equitable settlement of a claim when its 
liability had become reasonably clear or (2) refused to pay a claim without 
conducting a reasonable investigation of the claim.